## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MICHELLE M. L.,

                Plaintiff,

     v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

             Defendant.

Case No. 20 C 6793

Magistrate Judge Sunil R. Harjani

### MEMORANDUM OPINION AND ORDER

Plaintiff Michelle M. L. brings this action pursuant to 42 U.S.C. § 405(g) to review the final decision of the Acting Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Acting Commissioner's decision is affirmed.

### I. BACKGROUND

Michelle filed for DIB on March 1, 2018, alleging she became disabled beginning January 17, 2017 due to osteoarthritis, rheumatoid arthritis ("RA"), residuals from torn meniscus, and depression. Michell was born on November 11, 1958, making her 59 years old at the time of her DIB application. Michelle lives with her son in an apartment. She completed high school and one year of college and has worked as a billing clerk for a cable television company and an insurance company and as a retail store manager. Starting in August 2008, Michelle worked for Sally Beauty Supply and was subsequently promoted to a store manager in May 2014. In January 2017, Michelle suffered a sudden onset of left knee pain and swelling and an ultrasound documented a

Baker's cyst.[1]  A bilateral MRI then revealed a torn left medial meniscus and a small Baker's cyst

of the right knee.  Michelle underwent a left knee arthroscopy with partial medial meniscectomy

and chondroplasty on March 22, 2017.  She has not engaged in substantial gainful activity since

January 17, 2017 and is currently on long-term disability through her last employer's insurance.

Her date last insured is December 31, 2022.

Following a hearing, ALJ Deborah E. Ellis issued a decision on March 6, 2020, finding

that Michelle was not disabled. (R. 13-24).  The ALJ determined that Michelle had the severe

impairments of rheumatoid arthritis and osteoarthritis of the knees. *Id*. at 15-18.  The ALJ found

that Michelle's anxiety, depression, and alcohol abuse were not severe impairments and caused

only mild limitations in all four of the paragraph B criteria. *Id*. at 17-18.  The ALJ determined that

Michelle's impairments did not meet or medically equal a listed impairment. *Id*. at 18-19.  The

ALJ then concluded that Michelle had the residual functional capacity ("RFC") to perform a range

of light work except that she should never climb ladders, ropes, or scaffolding, can occasionally

crawl or kneel, and can frequently use her upper extremities bilaterally for handling/fingering. *Id*.

at 19-23.  The ALJ determined that Michelle could perform her past relevant work as a retail

manager as generally performed and as a billing clerk as actually and generally performed. *Id*. at

23-24.  As a result, the ALJ found Michelle not disabled from January 17, 2017 through the date

of the decision. *Id*. at 24.

## II.  DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment

---

[1]     A Baker's cyst is a "fluid-filled cyst that causes a bulge and feeling of tightness behind the knee and that often becomes more painful when the knee is fully extended or flexed or when the patient is active." *Beastrissa V. v. Saul*, 2020 WL 6381365, at *1 n.5 (N.D. Ill. Oct. 30, 2020).

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (internal quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

In support of her request for reversal and remand, Michelle contends that the ALJ: (1) improperly assessed her physical RFC; (2) erred in finding the opinion of consultative examiner Dr. Dinesh Jain unpersuasive; (3) erred in failing to find that her mental impairments were severe and not accounting for the limiting effects of her non-severe mental impairments in the RFC assessment; (4) improperly evaluated her subjective symptom allegations; and (5) erred at step four in listing the billing clerk job as work available to Michelle.[2] For the reasons discussed below, the Court affirms the decision of the ALJ.

## A.    RFC Assessment

Michelle first argues that the ALJ erred by "failing to explain the basis for the specific RFC limitations." Doc. 25 at 5. Specifically, Michelle insists that the ALJ violated the narrative requirements of Social Security Ruling ("SSR") 96-8p by failing to explain why greater standing/walking, lifting, and manipulative restrictions were not warranted in the RFC. *See* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) (the "RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot be reasonably accepted as consistent with the medical and other evidence."). The RFC is the "most physical and mental work the claimant can do on a sustained basis despite her limitations." *Madrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). In reaching her RFC assessment, the ALJ must "articulate at some minimal level her analysis of the evidence." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Ultimately, an ALJ need only include limitations in the RFC that are supported by the medical record. *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021).

---

[2]    Michelle has withdrawn her constitutional argument concerning the appointment of Andrew Saul as the Commissioner of Social Security. *See* Docs. 33-35.

### 1. Ability to Stand and Walk for Six Hours per Eight-Hour Workday

Michelle first argues that the ALJ failed to explain her conclusion that Michelle could perform the standing and walking requirements of light work. The Court disagrees. Light work requires standing and walking for up to six hours in an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). Contrary to Michelle's claim that the ALJ "declined to adopt the state agency opinions," the ALJ relied on the opinions of the state agency physicians, though she believed the record support some additional lifting, postural, and manipulative limitations related to Michelle's knees and hands. Doc. 25 at 5; (R. 22). In formulating the RFC, the ALJ reasonably determined that the September 2018 and January 2019 findings of the state agency reviewing physicians Victoria Dow, M.D., and Vidya Madala, M.D., were persuasive. *Id*. at 22, 67-68, 80-81. Drs. Dow and Madala concluded that Michelle remained capable of performing medium work. *Id*. 67-68, 80-81. Light and medium work both require standing and walking for up to six hours in an eight-hour day. *Homer W. v. Kijakazi*, 2022 WL 2828753, at *7 (N.D. Ill. July 20, 2022). The ALJ properly relied on the state agency physicians' opinions to support her RFC determination, including as to Michelle's standing and walking limitations. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Michelle does not challenge the ALJ's analysis of these opinions or contend that the state agency physicians' medical opinions were outdated.

Instead, Michelle cites evidence that she believes shows that she cannot stand or walk for six hours daily. *See* Doc. 25 at 5-6. Michelle points to her own testimony that she is able to stand for 30 minutes at a time and walk for 20 minutes to support a greater standing/walking restriction. *Id*. (citing R. 52). As discussed below, however, the ALJ's decision to partially discount Michelle's symptom allegations is supported by substantial evidence. Moreover, the state agency physicians considered most of the evidence Michelle cites, and they explicitly noted that

Michelle's alleged "limitations on walking are not supported by the treatment records." (R. 66-68, 79-81). The ALJ credited this aspect of the state agency physicians' opinions, and the Court "cannot reweigh the medical evidence or substitute its judgment for the ALJ's analysis with respect to how the medical opinions should be balanced." *Frank J. v. Saul*, 2020 WL 6447928, at *5 (N.D. Ill. Nov. 3, 2020). Michelle also cites an August 2018 consultative examination by Dr. Dinesh Jain which showed she had "puffiness of the left knee" and exhibited moderate difficulty getting on and off the exam table, severe difficulty walking on toes, severe difficulty walking on heels, an inability to squat and rise, and an inability to hop on one leg. (R. 502-03). Dr. Jain opined that Michelle could stand for 30 minutes and walk two blocks. *Id*. at 503. The ALJ discussed this consultative examination, noting these specific findings. *Id*. at 21. However, because Dr. Jain's own examination showed normal range of motion of all extremities, no swelling of any of the joints, normal muscle tone and mass bilaterally, normal motor function, no clubbing, cyanosis, or edema of the extremities, and normal gait and Dr. Jain's standing and walking limitations were contradicted by other medical evidence, the ALJ reasonably found Dr. Jain's opinion unpersuasive. *Id*. at 22-23. Further, the state agency reviewing physicians expressly considered Michelle's August 2018 consultative evaluation with Dr. Jain and concluded that Michelle did not have any limitation on standing or walking for six hours in an eight-hour workday. *Id*. at 67-68, 80-81. Accordingly, the ALJ adequately explained why Michelle can perform the standing and walking requirements of light work and more than a scintilla of evidence supports her decision.

Michelle accuses the ALJ of mischaracterizing the record when she wrote that "while [Michelle] presented regularly with complaints of knee pain and swelling, physical examinations were generally normal." Doc. 25 at 7. Without citing to the record, Michelle claims that "examinations frequently reflected abnormal knee and hip findings such as diffuse tenderness,

puffiness, effusion, positive McMurry's sign, medial joint line tenderness, limited knee strength, and swelling." Doc. 25 at 7. Contrary to Michelle's assertion, the record reflects that the ALJ did not mischaracterize Michelle's knee and hip condition. Michelle is correct that earlier treatment records showed: 4/5 left knee extension and 4/5 left knee flexion with pain the month prior to her left knee surgery in March 2017 (R. 439); medial joint line tenderness and pain with McMurray test in her left knee just prior to her knee surgery (*id*. at 302, 387-88, 389, 456-57, 467); mild diffuse joint tenderness shortly after her knee surgery (*id*. at 336, 346, 349, 360); moderate and then minimal/slight effusion post-left knee surgery and three left knee injections (*id*. at 336, 341, 346, 349, 351, 360, 385, 387); bilateral knee swelling in the recovery period following her left knee procedure in 2017 (*id*. at 332, 336, 341, 344, 360, 373, 481-83); and Dr. Dinesh documented puffiness of the left knee in August 2018 (*id*. at 502).

However, the ALJ reasonably viewed Michelle's knee condition after her March 2017 left knee surgery as one of some gradual improvement in her condition. The ALJ correctly noted that more recent examinations in 2018 and 2019 showed no musculoskeletal erythema, no joint swelling, no joint tenderness, no scoliosis, normal range of motion, no joint instability, normal muscle strength and tone, and normal gait. *Id*. at 22, 513, 519, 528, 588. As the ALJ also noted, in February 2019, Michelle reported that while she continued to have pain in her knees, she noticed improvement in her RA pain since being on methotrexate. *Id*. at 21, 581. The ALJ observed that at her February and May 2019 visits with her rheumatologist, Michelle did report knee pain. *Id*. at 21, 581, 596. Physical examinations at these visits revealed crepitus of the knees[3] but "only slight pain with flexion and extension bilaterally." *Id*. at 21, 583, 598. And Michelle did not complain of knee pain during her next visit with her rheumatologist in August 2019. *Id*. at 607. On physical

---

[3]     "[C]repitus is merely a cracking or popping sound, and does not necessarily indicate a decrease in functional ability." *Kadelak v. Astrue*, 802 F.Supp.2d 934, 944 (N.D. Ill. 2011).

examination in August 2019, Michelle again had crepitus of the knees but only slight pain with flexion and extension bilaterally and normal gait. *Id*. at 608. The ALJ also noted decreased range of hip motion in February 2019 and that in August 2019, Michelle reported bilateral hip pain aggravated when laying on her sides. *Id*. at 21, i583, 607. Upon exam in August 2019, hip ranges of motion were decreased with tenderness over the trochanteric bursa bilaterally but examination also revealed normal gait. *Id*. at 608. Given this record, the ALJ did not mischaracterize the record or selectively analyze the evidence relating to Michelle's knee and hip condition.

### 2. Ability to Lift 20 Pounds Occasionally and 10 Pounds Frequently

Michelle also contends that the ALJ did not adequately explain her finding regarding Michelle's lifting capacity. The ALJ found Michelle has the ability to perform the lifting/carrying requirements of light work. (R. 19). A light-work job "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). In support of her argument, Michelle points to her report on April 20, 2018 that she can lift about five pounds (R. 214), her son's report on April 21, 2018 that she can lift "a few pounds" (*id*. at 224), her May 2017 complaint of right shoulder pain when exercising with five pound weights (*id*. at 338), a May 2, 2017 physician finding that she had mild tenderness in her right shoulder AC joint and subacromial space with positive impingement (*id*.), and her complaints of knee and hip pain. Doc. 25 at 5-7. Michelle contends that this evidence supports her inability to lift 20 pounds during the workday. However, the ALJ explicitly considered Michelle's complaints of pain in her knees and hips and discussed findings regarding her knees and hip. (R. 19-22). The ALJ also noted that the state agency physicians opined that she could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. *Id*. at 22. The ALJ explained she found the state agency physicians' findings persuasive, but she partially credited Michelle's

complaints of knee pain due to osteoarthritis in determining that Michelle is capable of performing the lifting/carrying requirement of light work with certain postural limitations. *Id*. at 22. The ALJ was entitled to rely on the stage agency physicians' opinions and to accommodate Michelle's complaints of pain in her knees by reducing the amount of weight she can lift. *Whitehead v. Saul*, 841 F. App'x 976, 982 (7th Cir. 2020) (internal citations and quotations omitted) ("the ALJ is not required to rely entirely on a particular physician's opinion[.]"). Because the RFC includes lifting limitations greater than those present in the persuasive state agency physicians' opinion evidence, the ALJ gave "reasoned consideration given to the evidence [Michelle] presented." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).[4]

While the ALJ did not specifically mention Michelle's alleged inability to lift more than five pounds or the May 2017 findings regarding her right shoulder, an ALJ is not required to "discuss every piece of evidence in the record." *Deborah M.*, 994 F.3d at 788; *Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("True, the ALJ's summary does not mention every detail. But it need not."). Moreover, the ALJ explicitly acknowledged that Michelle's December 8, 2018 Function Report stated that her "impairments affected her ability to lift." (R. 20, 242). And on the same page of the Function Report cited by the ALJ, Michelle wrote that she could lift 10 pounds. *Id*. at 242. Thus, it is clear that the ALJ considered Michelle's alleged lifting limitations. With respect to her right shoulder pain and impingement, the ALJ found persuasive the opinions of the state agency physicians who reviewed Michelle's medical records, including her right shoulder x-ray, and found that Michelle retained the ability to occasionally lift 50 pounds and frequently lift

---

[4]     In contrast to the case cited by Michelle, the ALJ here identified what additional evidence she relied upon to support her conclusion that Michelle needs greater lifting, postural, and manipulative limitations than those opined to by the state agency physicians. *Keno B. v. Kijakazi*, 2021 WL 3290809, at *3-4 (N.D. Ill. Aug. 2, 2021). Specifically, the ALJ stated that she found Michelle's allegations of pain in her knees due to osteoarthritis and testimony about numbness in her hands justified greater functional limitations in lifting, postural, and manipulative abilities. (R. 22).

25 pounds. *Id*. at 22, 68, 81. Finally, no opinion in the record indicates that Michelle is incapable of lifting 20 pounds occasionally and 10 pounds frequently. *Gedatus*, 994 F.3d at 904. Even the consultative examiner found that Michelle could lift and carry 30 pounds. (R. 503). For all of these reasons, the ALJ reasonably found that Michelle could perform light work lifting demands and she adequately discussed why the medical evidence supported her determination. There is no basis for remand on this issue.

### 3. Ability to Handle and Finger Frequently

Michelle next complains that the ALJ concluded that she was a capable of frequent, as opposed to occasional, handling and fingering and failed to sufficiently explain this finding. The Court rejects this challenge because the ALJ gave supported reasons for why she found that Michelle can frequently handle and finger bilaterally. In particular, the ALJ supported the RFC limitation of frequent use of upper extremities bilaterally for handling and fingering by relying on the state agency physicians' opinions and partially accepting Michelle's testimony about numbness in her hands. (R. 22). The state agency physicians reviewed Michelle's records and concluded that she was capable of a full range of medium work without any manipulative limitations. *Id*. at 67-68, 81. The ALJ found the state agency physicians' opinions persuasive, but she explained that Michelle's later testimony of numbness in her hands that affects her ability to perform tasks with them supported a limitation to frequent use of her hands for handling and fingering. *Id*. at 19, 22, 54-55. The ALJ pointed to Dr. Jain's August 2018 consultative exam during which Michelle exhibited normal range of motion along all the joints of the upper extremities, there was no redness of swelling of any of the joints, pulses in the arms were normal, finger dexterity was normal, grip strength of both hands was normal, fine finger manipulation was normal, and there was no

evidence of clubbing, cyanosis, or edema. *Id*. at 21. As the ALJ noted, Dr. Jain concluded that Michelle had no limitations in handling objects. *Id*. at 22-23.

The ALJ also considered records from Michelle's subsequent medical appointments. For example, the ALJ noted: (1) Michelle's October 2018 physical examination showed a full painless active and passive range of motion of all four extremities and no edema or cyanosis; (2) in February 2019, Michelle reported to her rheumatologist continued pain specifically in her hips and knees but also that she noticed improvement in her RA pain since being on methotrexate; (3) at that time, she reported joint stiffness lasting approximately 30 minutes or less in the morning but denied any swelling in her hands and wrists; (4) Michelle's February 2019 examination of her hands showed slight ulnar deviation but there was no synovitis or tenderness of the metacarpophalangeal joints, proximal interphalangeal joints, and distal interphalangeal joints bilaterally; (5) in May 2019, Michelle reported that her joint stiffness lasted one hour in the morning and joint pain and swelling in her hands with the right greater than the left; (6) in August 2019, Michelle complained of joint stiffness lasting over an hour in the morning and persistent pain and swelling in her hands; and (7) physical examinations on June 25, 2018, October 28, 2018, November 6, 2018, and February 14, 2019 revealed no musculoskeletal erythema, no joint swelling, no joint tenderness, normal range of motion, no joint instability, and normal muscle strength and tone. (R. 21, 513, 519, 528, 547, 581, 583, 588, 596, 624, 628). With respect to her wrists, elbows, and shoulders, Michelle's February 2019 examination with her rheumatologist was normal and without pain. *Id*. at 583. On August 22, 2019, Michelle's musculoskeletal examination of her wrists, elbows, and shoulders was again normal with slight ulnar deviation, synovitis, and tenderness of the metacarpophalangeal joints, proximal interphalangeal joints, and distal interphalangeal joints of her hands bilaterally.

*Id.* at 608.  The ALJ reasonably found that this medical evidence combined with the opinion evidence failed to support a limitation to occasional handling and fingering.

Significantly, the ALJ's frequent manipulative limitation was more restrictive than the conclusions of the state agency physicians and Dr. Jain. *Kristine H. v. Kijakazi*, 2022 WL 910584, at *6 (N.D. Ill. March 29, 2022).  Thus, a "fundamental problem" with Michelle's argument is that no doctor recommended greater manipulative limitations than those assigned by the ALJ. *Gedatus*, 994 F.3d at 904; *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error.").  In other words, there were no occasional manipulative limitations supported by the medical record, and the ALJ was therefore not required to incorporate an occasional handling and fingering limitation into the RFC. *Deborah M.*, 994 F.3d at 791 (upholding ALJ's decision not to include any manipulative limitations in the RFC despite claimant's reported difficulties using her hands due to carpal tunnel syndrome because no doctor ever found that she had manipulative limitations); *Zoch v. Saul*, 981 F.3d 597, 603 (7th Cir. 2020) (ALJ properly concluded that claimant could use her hands frequently (not occasionally) at work where the "record lacked evidence of handling limitations, except for [claimant's] testimony, which the ALJ reasonably found unreliable.").  As a result, the ALJ adequately assessed Michelle's manipulative limitations and explained her reasons, which are supported by more than a scintilla of evidence, for finding that Michelle is capable of frequent handling and fingering bilaterally.

## B.    Consulting Examiner Opinion

Michelle next argues that the ALJ improperly evaluated the opinions of consultative examiner Dr. Dinesh Jain who examined Michelle in person on behalf of the agency.  "As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary

12

opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). However, "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Id*. Finally, the Court notes that it does "not review medical opinions independently but rather review[s] the ALJ's weighing of those opinions for substantial evidence," and only "overturn[s] that weighing if no reasonable mind could accept the ALJ's conclusion." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022).

Dr. Jain examined Michelle on August 16, 2018 and found that she suffers from a history of rheumatoid arthritis with polyarthritis involving the knees, hips, ankles, wrists, and hands, osteoarthritis involving the knees, ankles and hips, and a history of depression. (R. 503). Dr. Jain opined that Michelle was limited to sitting for 60 minutes due to pain in both hips and low back, standing for 30 minutes due to pain in her ankles and hips, and walking two blocks.[5] *Id*. The ALJ found Dr. Jain's sitting, standing, and walking limitations unpersuasive for four reasons: (1) they were "inconsistent with and not supported by the objective medical evidence"; (2) they were "inconsistent with his own examination findings"; (3) they were based on a single examination; and (4) Dr. Jain was not familiar with Michelle, her impairments, or her course of care *Id*. at 23. Three of these reasons withstand scrutiny, making an error with the remaining reason harmless.

First, the ALJ considered the objective medical evidence and determined that Dr. Jain's siting, standing, and walking limitations were not consistent with or supported by the record. As explained above and as the ALJ noted, after Dr. Jain's August 2018 examination, several physical examinations documented no musculoskeletal erythema, no joint swelling, no joint tenderness, no

---

[5] Dr. Jain also found that Michelle could lift up to 30 pounds and added that Michelle has no limitation on handling objects or hearing/speaking. (R. 503).

scoliosis, normal range of motion, no joint instability, normal muscle strength and tone, and normal gait. (R. 22). Michelle argues that the abnormal knee and hip examination findings in the record support Dr. Jain's conclusions. The ALJ discussed some of the abnormal knee and hip examination findings, but she also adequately explained that physical examinations subsequent to Michelle's knee surgery and injections were "essentially normal." *Id*. at 20-22. The opinions of Drs. Dow and Madala also support the ALJ's conclusion that Dr. Jain's limitations as to sitting, standing, and walking were unpersuasive. Again, Drs. Dow and Madala specifically considered and rejected Dr. Jain's sitting, standing, and walking findings during the consultative exam. (R. 66-68, 80-81). They concluded that Michelle could sit, stand and walk for six hours in an eight-hour workday and lift 50 pounds occasionally and 25 pounds frequently. *Id*. at 67, 80. The ALJ found their opinions persuasive and "generally consistent with the objective medical evidence that showed essentially normal physical examinations." *Id*. at 22. The ALJ reasonably found that Dr. Jain's opinion was inconsistent with the other evidence of record given that the state agency reviewing physicians reviewed some of the evidence following the consultative examination and determined that Michelle could perform the sitting, standing, walking, and lifting requirements of medium exertional work.

Moreover, the ALJ did not play doctor and make an independent medical conclusion by finding that Dr. Jain's opinion was not consistent with and not supported by the objective medical evidence. The ALJ relied on the persuasive opinions of two separate state agency reviewing physicians, Drs. Dow and Madala, who both considered and rejected Dr. Jain's sitting, standing, and walking limitation opinions. (R. 22, 66-68, 80-81); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012) ("ALJ did not err or improperly 'play doctor' by examining the medical record and determining that [a doctor's] conclusions were unsupported by his own treatment notes or

contradicted by other medical evidence."). The relevant regulation requires the ALJ to evaluate the consistency and supportability of Dr. Jain's opinions with other evidence of record. 20 C.F.R. § 404.1527c(c)(1)-(2).

Second, the ALJ explained that the significant limitations in Dr. Jain's assessment conflicted with his own examination notes, which documented: normal range of motion of the upper and lower extremities, no swelling, normal muscle tone and mass bilaterally, normal motor function, and no clubbing, cyanosis, or edema of the extremities. (R. 23). Earlier in the RFC analysis, the ALJ noted Dr. Jain's finding that Michelle's gait was normal without any assistive device, which undermines the supportability of his opinion. *Id*. at 21, 503. Dr. Jain further found normal range of motion along the cervical and lumber spine. *Id*. at 503. Contrary to Michelle's assertion, the ALJ also did selectively consider Dr. Jain's examination findings or fixate on normal findings. Rather, in evaluating Dr. Jain's report, the ALJ expressly mentioned the abnormal findings from Dr. Jain's examination that Michelle cites in her brief. (R. 21); Doc. 25 at 14. Therefore, the ALJ explained with sufficiently clarity the inconsistency of Dr. Jain's opinions with his own objective findings during his examination and this reason for discrediting Dr. Jain's opinion is supported by the record.

Michelle also asserts that the ALJ did not explain why the abnormal findings by Dr. Jain did not render Dr. Jain's opinion supported, nor why certain normal examination findings by Dr. Jain outweighed the abnormal ones. But the ALJ did explain that just prior to and subsequent to the consultative examination in August 2018, various examinations "showed essentially normal physical examinations," including no musculoskeletal erythema, no joint stiffness, no joint tenderness, no scoliosis, normal range of motion, no joint instability, normal muscle strength and tone, and normal gait. (R. 22). Further, the ALJ relied on the opinions of the state agency

physicians who reviewed the record in September 2018 and January 2019 and both found that Michelle was not as limited as Dr. Jain opined. *Id*. at 22. The ALJ also noted that in February 2019, Michelle reported improvement in her RA pain since taking methotrexate. *Id*. at 21. Thus, the ALJ adequately explained why he found Dr. Jain's opinions were not supported by the objective medical evidence and his own abnormal findings.

This leaves two remaining reasons for why the ALJ discredited Dr. Jain's medical opinion. First, the ALJ stated that Dr. Jain's opinion was based on a single examination. (R. 23). The regulation allows for the ALJ to address the "[f]requency of examinations." 20 C.F.R. § 404.1520c(c)(3)(ii). But that reason alone cannot logically suffice for the ALJ to adopt the non-examining state agency physicians' opinions over Dr. Jain's opinion. *Paul v. Berryhill*, 760 F. App'x 460, 464 (7th Cir. 2019) ("[T]he ALJ wrongly discounted Dr. Powell's opinion for being based on a one-time examination when he gave 'great weight' to non-examining physician Dr. Pressner, whose opinion was *based on a one-time review* of Paul's mental-health records (including a review of Dr. Powell's own examining notes.")); *see also* 20 C.F.R. § 404.1520c(c)(3)(v) ("A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder."). Accordingly, the fact that Dr. Jain only performed a one-time evaluation is not a proper reason to reject Dr. Jain's opinions and give more weight to the opinions of Drs. Dow and Madala.

The final remaining reason given by the ALJ for rejecting Dr. Jain's opinion is adequate. The ALJ found that Dr. Jain was "not familiar with [Michelle] or her impairments and course of care." (R. 23). In completing his consultative exam, Dr. Jain apparently did not review any of Michelle's treatment records and therefore did not have a longitudinal perspective of Michelle's

impairments.[6]   Although Drs. Dow and Madala did not personally examine Michelle, they reviewed Michelle's full medical records in September 2018 and January 2019. "[E]vidence showing a medical source has familiarity with other evidence in the claim" is a relevant consideration under the regulation. 20 C.F.R. § 404.1520c(c)(5).   Thus, while Dr. Jain's opinion was based on his own examination of Michelle, he had an incomplete picture of the history and progress of her impairments and treatment.   In contrast, the ALJ determined that Drs. Dow and Madala's opinions were persuasive, in part, because they "offered a thorough and detailed recitation of the evidence available at the time with citations to the objective record" and their findings were "consistent with a range of examinations and [Michelle's] overall course of care." (R. 22).   And as the ALJ noted and Dr. Madala noted on reconsideration, more recent medical records indicated Michelle exhibited full range of motion, normal gait, and full strength. *Id*. at 22, 81.

In short, the Court finds that the ALJ provided a good explanation for rejecting Dr. Jain's opinions about Michelle's abilities to sit, stand, and walk.   Although the ALJ erred when she credited the state agency reviewing physicians' opinions over Dr. Jain's medical opinion because Dr. Jain evaluated Michelle on only one occasion, this error was harmless because the ALJ gave three other valid reasons supported by the record for not adopting Dr. Jain's opinions. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) ("[A]ny error here was harmless given the other reasons the ALJ cited for discounting Dr. Callier's opinions.").

---

[6]     Dr. Jain's report does not refer to any medical records, and he based his assessment of Michelle's "past medical history" on her description. (R. 501-02).   Michelle does not dispute that Dr. Jain did not review her medical records as part of his examination.

**C.    Mental Impairments**

Michelle also takes issue with the ALJ's finding at step two that her mental impairments are not severe and her failure to incorporate any mental limitations in the RFC.  "When determining a claimant's residual capacity to work, the ALJ must consider in combination all limitations on a claimant's ability to work, including those that are not individually severe." *Krug v. Saul*, 846 F. App'x 403, 406 (7th Cir. 2021).  "Although a mild limitation in an area of mental functioning does not necessarily prevent an individual from securing gainful employment, the ALJ must still affirmatively evaluate the effect of that limitation on the claimant's RFC." *Judy D. v. Saul*, 2019 WL 3805592, at *4 (N.D. Ill. Aug. 13, 2019) (internal citation and quotation marks omitted).

The ALJ adequately considered the evidence regarding Michelle's mental impairments.  At step two, the ALJ noted Michelle's mental impairments of anxiety, depression, and alcohol abuse and evaluated the relevant evidence. (R. 17-18).  Consistent with the opinions of the state agency psychological consultants, the ALJ concluded that Michelle had mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. *Id*. at 17-18; 65, 78.  In determining that her mental impairments caused no more than a mild limitation in the four areas of functioning, the ALJ considered Michelle's statements in her latest Function Report and testimony, including her statements that: her impairments affected her memory and ability to concentrate but not her understanding or ability to follow instructions or complete tasks; she does not need reminders to take care of personal needs and grooming, to take her medications, or to go places; she could follow spoken and written instructions "ok," although she had some difficulty with written instructions and sometimes needs to re-read them; she had no problems getting along with family, friends, neighbors, authority figures, or others; she spent time with others including visiting her

mother twice per week; she could finish what she starts and could pay attention "for as long as it takes"; she could play games on her cell phone, watch television, read, manage money (pay bills, count change, handle a savings account, and use a checkbook/money order); and she could prepare simple meals, do laundry once per week, drive, and shop for a small amount of groceries. *Id*. at 17-18.  The ALJ also noted the normal findings from the Mental Status Evaluation conducted by Ericka Swanson, Psy.D., in August 2018. *Id*. at 17. The ALJ further found that other examinations generally showed that Michelle appeared calm, polite, interactive, and cooperative with appropriate mood and affect, intact short- and long-term memory, normal attention span, judgment, insight, and calculation abilities. *Id*. at 17-18.

The ALJ did not include any mental-impairment-based limitations in the RFC.  Michelle suggests that a time-off task limitation to manage low motivation and an allowance for a slower work pace should have been included in the RFC to accommodate her mental impairments. Contrary to Michelle's assertion, the ALJ considered her non-severe mental impairments in determining her RFC and properly omitted limitations regarding time off-task and slower work place.  In her RFC assessment, the ALJ noted Michelle's testimony and reports about her mental symptoms. *See* (R. 19) (citing testimony that she has no energy and experiences fatigue); *Id*. at 19-20 (citing testimony that she suffers from depression and sometimes lacks motivation to do anything); *id*. at 20 (citing testimony that she has difficulty making decisions and lacks focus); *id*. at 20 (citing December 2018 Function Report stating she suffers from depression and has no motivation or energy to perform activities).  The ALJ further noted that in August 2018, Michelle told Dr. Swanson that she was not treating with a psychologist or psychiatrist. *Id*. at 20, 4-45.  Michelle also testified that beginning in November 2018, she took Citalopram which helped a little with her depression. *Id*. at 45.

19

In addition, the ALJ evaluated the mental opinion evidence of record. The ALJ noted that Dr. Swanson evaluated Michelle in August 2018 and diagnosed her with major depressive disorder unspecified with anxious distress due to general medical. (R. 23, 490-93). Although the ALJ could have done more to articulate her consideration of the evidence with respect to Michelle's mental impairments in her RFC analysis, the ALJ found that Dr. Swanson's assessment was persuasive because there was "some evidence" that Michelle "experienced symptoms of depression." *Id*. at 23. The ALJ further found, however, that there was no evidence that these symptoms significantly limited Michelle's ability to function. *Id*. As the ALJ noted, Michelle exhibited normal findings on the mental status examination with Dr. Swanson despite her major depressive disorder with anxious distress. *Id*. at 17, 492-93.

In assessing Michelle's mental impairments, the ALJ also permissibly relied on the state agency psychological consultants—who reviewed Michelle's record and found that her mental impairments caused a mild limitation in each of the four areas of mental functioning and were non-severe. (R. 22, 64-65, 76-78). If the degree of limitation is rated as "none" or "mild" in all four areas, then the mental impairment generally is non-severe. 20 C.F.R. § 404.1520a(d)(1). A non-severe impairment "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). The state agency psychological consultants' non-severe assessment was not contradicted by any medical sources. Moreover, no treating, examining, or reviewing medical source indicated that Michelle's mental impairments caused any specific work limitations related to off-task time or a slower work pace. *Jiri K. v. Kijakazi*, 2022 WL 2704058, at *7 (N.D. Ill. July 12, 2022) ("Notably, the record before the ALJ contained no opinion from any mental health professional which would indicate the need for any limitations specific to slower pace or off-task time."). Based on this record, the ALJ sufficiently discussed Michelle's mental

impairments and supported her RFC without mental restrictions with more than a scintilla of evidence. *Donna J. v. Saul*, 2021 WL 2206160, at *10 (N.D. Ill. June 1, 2021). ("When reading the ALJ's decision as a whole, [] the extensive discussion at step two of Plaintiff's mental health treatment records as well as her functional abilities is sufficient to trace the ALJ's reasoning for declining to include mental limitations in the RFC finding.") (citations omitted).

Michelle argues that the ALJ's finding that Dr. Swanson's diagnosis of "*major* depressive disorder was persuasive established that [Michelle's] depression was severe" at step two. Doc. 25 at 10; (R. 493).  This argument fails.  To begin, "a diagnosis alone does not establish that an impairment is severe or disabling." *Yvonne K. C. v. Kijakazi* 2022 WL 1104506, at *6 (N.D. Ill. April 13, 2022).  Michelle "having been diagnosed with these [mental] impairments does not mean they imposed particular restrictions on her ability to work . . . It was [Michelle's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018); *McGillem v. Kijakazi*, 2022 WL 385175, at *4 (7th Cir. 2022) ("Medical evidence supports the existence of the condition, but the need for restrictions cannot be inferred from the diagnosis alone.").  Michelle did not meet her burden to show with medical evidence that her mental impairments are severe.

Moreover, "[s]tep two is merely a threshold inquiry; so long as one of the claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).  Regardless of whether Michelle's mental impairments were considered severe, "the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." *Ray*, 915 F.3d at 492. Accordingly, "any error at Step Two is harmless if the ALJ finds a claimant has *any* severe

impairment and goes on to sufficiently address the aggregate effect of all the claimant's severe and non-severe impairments later in his analysis." *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *2 (N.D. Ill. May 31, 2019). Here, the ALJ found that Michelle had other severe impairments—namely, rheumatoid arthritis and osteoarthritis—and, as explained above, she addressed Michelle's severe and non-severe impairments in crafting her RFC. Accordingly, any error in finding her mental impairments non-severe at step two was harmless.

## D.    Subjective Symptoms

Michelle next challenges the ALJ's evaluation of her subjective complaints about her symptoms, arguing that the ALJ mischaracterized the medical record and her course of care, improperly relied upon findings that she was in "no acute distress," and improperly considered her daily activities. "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts,* 27 F.4th at 1278. Rather, in considering a claimant's subjective symptoms, an ALJ assesses the objective medical evidence and a number of other factors, including the claimant's daily activities, effectiveness and side effects of any medication, treatment, other methods to alleviate symptoms, and factors that precipitate and aggravate pain. SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. § 404.1529(c). "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279.

The ALJ determined that Michelle had the RFC to perform a range of light work, finding that her statements about disabling pain and symptoms were not credible. (R. 20). The ALJ explained that the totality of the evidence "made it difficult to rely heavily on [Michelle's] subjective complaints," because the extent to which pain and symptoms limited her was minimal,

she displayed a normal gait, she appeared in no acute distress, and she engaged in several activities of daily living throughout the period that she alleged disability. *Id*. at 20. Accordingly, the ALJ explained that she "relied greatly on the objective medical evidence of record and the persuasive medical opinion statements." *Id*. The ALJ found the state-agency physicians' opinions that Michelle could perform a full range of medium work persuasive. *Id*. at 22. But the ALJ credited some of Michelle's testimony when she limited her to light work with various postural restrictions to account for her pain in her knees and frequent use of her upper extremities bilaterally for handling/fingering to account for numbness in her hands. *Id*.

The ALJ's subjective symptom analysis was not patently wrong. In partially discounting Michelle's subjective statements, the ALJ found them inconsistent with objective medical evidence showing generally normal physical examinations from June 2018 forward. (R. 20-23). "[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Michelle insists that the ALJ mischaracterized the record in stating "physical examinations were generally normal" because the "record reflects abnormal knee, hip, and wrist examinations," again relying mostly on records from prior to or just after her March 2017 knee surgery. (R. 20); Doc. 25 at 15. However, the ALJ fairly represented the record. As explained earlier, later examinations on June 28, 2018, November 6, 2018, and February 14, 2019 showed no musculoskeletal erythema, no joint swelling, no joint tenderness, no scoliosis, normal range of motion, no joint instability, normal muscle strength and tone, and normal gait. (R. 22, 513, 519, 588). The ALJ also cited the August 2018 consultative examination by Dr. Jain which noted degenerative disease changes of both knees with puffiness of the left knee, but the range of motion along all joints of the lower extremities was within normal limits, there was no swelling of any of the joints of the lower extremities, no clubbing, cyanosis,

or edema of the lower extremities, normal muscle tone and muscle mass bilaterally with no loss of any motor function bilaterally in any of the extremities, and normal gait. *Id*. at 21, 502. The ALJ observed that while Dr. Jain's examination showed some degree of puffiness of the lateral part of the left ankle, the range of motion was normal. *Id*. With respect to her upper extremities, Dr. Jain found all the joints of the upper extremities within normal limits, no redness or swelling of any of the joints, pulses in the arms were normal, finger dexterity was normal, grips strength of both hands was normal, fine finger manipulation was normal, and there was no evidence of clubbing, cyanosis, or edema. *Id*. The ALJ further noted an October 28, 2018 examination at an emergency room visit showed full painless active and passive range of motion of all four extremities, no edema or cyanosis, and intact gait. *Id*. at 21, 528.

The ALJ confronted many of the abnormal findings in the record but concluded— supported by the state agency physicians' medical opinions—that any abnormal findings did not support greater limitations than those provided in the RFC. (R. 22). The ALJ acknowledged that Michelle reported continued pain, specifically in her hands and knees at a rheumatology visit on February 14, 2019, but she also reported improvement in her RA pain since being on methotrexate. *Id*. at 21, 581. The ALJ further acknowledged that Michelle reported morning joint stiffness lasting 30 minutes or less, but she denied any swelling in her hands and wrists. *Id*. The ALJ considered that the physical examination on February 14, 2019 showed decreased range of motion of the hips with internal and external rotation bilaterally and crepitus in the knees but only slight pain with flexion and extension bilaterally. *Id*. at 21, 583. Moreover, the ALJ noted that the February 2019 examination of Michelle's hands showed slight ulnar deviation, but there was no synovitis or tenderness of the metacarpophalangeal joints, proximal interphalangeal joints, and distal interphalangeal joints bilaterally. *Id*. Finally, the ALJ acknowledged Michelle's complaints of

24

stiffness lasting one hour in the morning, joint pain and swelling in her hands with right greater than left, achy feet and stiffness at night, and knees and back hurting constantly in May 2019 and cited an August 2019 visit in which Michelle reported bilateral hip pain aggravated when laying on her sides, intermittent neck pain aggravated with certain movements, joint stiffness lasting over an hour in the morning, and persistent pain and swelling in her hands. *Id*. at 21-22, 596, 607. At these visits, Michelle's rheumatologist noted that her RA was active and prescribed a trial of prednisone in May 2019 and ordered an x-ray of the cervical spine and prescribed a muscle relaxant to help with muscles spasms in August 2019. *Id*. at 601, 611. At the hearing, Michelle confirmed that when there is some activity in her RA, her rheumatologist "gives [her] a round of steroids and that seems to work pretty well." *Id*. at 48. Given this record, the ALJ reasonably weighed the evidence and determined that the limitations resulting from Michelle's RA and osteoarthritis were not as severe as she alleged. Accordingly, the Court cannot reweigh the medical evidence regarding Michelle's impairments or substitute its judgment for that of the ALJ's. *Deborah M.*, 994 F.3d at 788.

Michelle further contends that the ALJ erred when considering her subjective symptoms by characterizing her course of care as "fairly conservative." (R. 23). "Receipt of conservative treatment is a legitimate reason to find a claimant not entirely credible." *Calvin B. v. Kijakazi*, 2022 WL 3018313, at *7 (N.D. Ill. July 29, 2022); *Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) ("An ALJ is entitled to consider the course of a claimant's treatment.").

Michelle argues that her left knee surgery and three Orthovisc injections in her left knee thereafter cannot be deemed conservative. The Acting Commissioner maintains that outside of Michelle's left knee operation in March 2017, the ALJ correctly noted that Michelle received fairly conservative treatment of injections and medication. The Court finds no reversible error in the

ALJ's characterization of Michelle's treatment. The ALJ found that Michelle's treatment was "fairly," though not completely, conservative. The ALJ's characterization of Michelle's treatment is accurate; her treatment has for the most part been conservative. Though Michelle did undergo left knee surgery in March 2017 which was at the beginning of the relevant period of time, her subsequent treatment over the next three years was largely conservative, consisting of three knee injections and medication. *Frank S. v. Kijakazi*, 2022 WL 832660, at *8 (N.D. Ill. March 21, 2022) ("The Seventh Circuit has consistently affirmed that conservative treatment consisting of pain medications and injections is a proper reason to discount a claimant's symptom allegations."). And after mid-September 2017, Michelle did not receive any treatment beyond medication. Further, the ALJ correctly noted that Michelle told her rheumatologist that her medication was helpful in alleviating some of her RA pain. (R. 21). And Michelle testified that when her RA is active, a round of steroids "seems to work pretty well." *Id*. at 48. The ALJ did not err in finding that Michelle's treatment of injections and medication was conservative. *Prill*, 23 F.4th at 749 ("Prill's treatment—injections, orthotics, and physical therapy—was conservative."); *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2015) (epidural steroid injections for back pain "have been characterized as 'conservative treatment.'"); *Simila*, 573 F.3d at 519 (affirming an adverse credibility finding based on the claimant's "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session.").

Moreover, the ALJ did not ignore Michelle's surgery. The ALJ pointed out that Michelle exhibited well-healed surgical scars with mild swelling and tenderness, as well as no neurological compromise, vascular compromise, or deep vein thrombosis at examinations of her left knee in September and October 2017. (R. 21). Relying on post-surgical examination records, the ALJ noted that while Michelle "presented regularly with complaints of knee pain and swelling, physical

examination records were generally normal." *Id*. at 20. Taken as a whole, the ALJ appropriately considered Michelle's surgery in her overall credibility analysis and appropriately characterized her overall course of care as "fairly conservative."

The ALJ also relied on evidence that Michelle's activities of daily living suggested that she was not as limited during the relevant time period as she alleged. Michelle contends that the ALJ failed to explain how any of her daily activities suggested a greater functional capacity than she claimed. An ALJ is required to evaluate a claimant's activities of daily living and explain why the claimant's activities are inconsistent with her description of her symptoms. SSR 16-3p; 20 C.F.R. § 404.1529(c)(3)(i); *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).

Here, the ALJ adequately explained why Michelle's daily activities undermined her subjective complaints and are not consistent with other evidence in the record. At step two and in her RFC evaluation, the ALJ identified the specific activities which suggested that Michelle was less limited than she alleged. (R. 17-18, 20). The ALJ pointed to certain inconsistencies between Michelle's subjective complaints and the record. For example, the ALJ noted that Michelle testified that due to pain, she could only stand for approximately 30 minutes, walk for approximately 20 minutes, and that daily numbness in her hands hinders her ability to perform any tasks with them. *Id*. at 19, 52-53, 55. But the ALJ pointed out that Michelle also reported that she is capable of preparing simple meals, doing laundry once a week, driving, shopping for a small amount of groceries, occasionally playing cards with her daughter, performing floor exercises, scooping the litter box, cleaning the bathroom, occasionally vacuuming, and paying bills. *Id*. at 20, 48-41, 239-40; *Prill*, 23 F.4th at 748 ("the ALJ appropriately considered that—despite Prill's claimed limitations relating to standing, sitting, kneeling, squatting, and crouching—she cooked,

baked, vacuumed, did laundry, loaded the dishwasher, drove, played cards, gardened, and cared for minor children.").

Additionally, the ALJ noted that Michelle stated she suffers from depression, which affects her memory and ability to concentrate and she "has no motivation or energy to perform activities." (R. 17, 22, 54). However, the ALJ explained that Michelle also indicated she can prepare simple meals, do laundry once a week, drive, shop for a small amount of groceries, and play games on her phone and cards when her hands did not bother her too much. *Id*. at 18, 48, 51, 239-40. The ALJ noted that Michelle spends time with others including visiting her mom twice a week, she can finish what she starts and can pay attention "for as long as it takes," and she watches television, reads, and can manage money (pay bills, count change, handle a savings account, and use a checkbook/money order). *Id*. at 17-18, 238, 240-42. Although Michelle's "ability to perform [these] daily activities does not necessarily translate into an ability to work full time . . . the ALJ correctly looked at [her] daily activities to see if they corroborated her [symptom] claims, and she found that they did not." *Deborah M.*, 994 F.4d at 791. Based on the inconsistencies between Michelle's subjective allegations and her own reports of her daily activities, the ALJ reasonably identified her daily activities as one reason to discount her subjective symptom statements.

Finally, Michelle challenges the ALJ's subjective symptom determination because the assessment relied on the fact that she appeared at numerous examinations in "no acute distress." (R. 20). Michelle argues that no "acute distress" does not mean that a claimant does not experience chronic, disabling pain. She points to one case stating that "acute" "refers to a disease, health effect, or symptom having a sudden, abrupt onset and a short, but severe, course, as opposed to a chronic condition or symptom having a slow development and a protracted but mild course." *Wanserski v. Colvin*, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015). The *Wanserski* court

noted that to physicians, "'no acute distress' means that your patient will probably not become unstable in the next 5 minutes." *Id*. On the other hand, "a significant number of other courts have ruled that a finding of 'no acute distress' is a relevant factor for an ALJ to consider in a symptom evaluation." *John J. v. Kijakazi*, 2021 WL 3910750, at *5 (N.D. Ill. Sept. 1, 2021). Standing alone and without further explanation, the Court agrees that Michelle's lack of acute distress at various examinations is not a particularly compelling reason to discount her statements about the severity of her symptoms. That said, the ALJ's reliance on this reason is not a reversible error. *Id*. (noting that the "Seventh Circuit has upheld an ALJ's decision in which the ALJ relied on examination notes that a claimant was in no acute distress along with other evidence to evaluate the severity of a claimant's symptoms."); *see also Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (ALJ properly "considered the evidence of [claimant's] daily activities in balance with the rest of her record, including evidence that her doctors noted 'no apparent physical distress,' even on the days when she complained of pain, a lack of evidence that she had 'significant sensation loss, significantly reduced joint motion, muscle spasms, muscle atrophy, motor weakness,' or other symptoms 'associated with the pain that would prevent her from performing sedentary work.'"). And even if it was error, the other reasons cited for discounting Michelle's complaints of disabling pain and symptoms are sufficient. *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are . . ., and here the ALJ cited other sound reasons for disbelieving [claimant].").

In sum, the ALJ properly contrasted Michelle's subjective complaints with the largely normal objective findings on her post-surgery examinations, the persuasive reports of the state agency physicians, her conservative post-surgery care, her effective use of medication, and her daily activities. Any error in the ALJ relying on her being without acute distress at various

examinations is harmless because the ALJ's partial adverse credibility finding was supported by these other valid reasons supported by the record. Thus, more than a scintilla of evidence supports the ALJ's partial discrediting of Michelle's subjective complaints, and Michelle's arguments provide no basis for reversal. *Matthews v. Saul*, 833 F. App'x 432, 438 (7th Cir. 2020) (holding that the ALJ's partially adverse credibility finding was not patently wrong because substantial evidence in the record supported the ALJ's conclusion that the claimant's complaints were not entirely consistent with the record).

## E.    Step Four Finding

Lastly, Michelle argues that the ALJ erred by relying on the testimony of the VE that a hypothetical claimant with her limitations could return to her billing clerk job as generally performed. A claimant is not disabled at step four if she can perform her past relevant work either as she actually performed it or as it is generally performed in the national economy. 20 C.F.R. § 404.1560(b)(2)-(3). Michelle "bears the burden of establishing that she is unable to return to her past relevant work." *Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988); *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022).

The ALJ found that Michelle could perform her past relevant work as a retail manager as generally performed and as a billing clerk as actually and generally performed. (R. 24). Michelle contends that the VE's testimony about the billing clerk job conflicted with the Dictionary of Occupational ("DOT") because the billing clerk job requires constant fingering, which is in excess of the frequent fingering capabilities in the ALJ's RFC assessment. Michelle is correct that the ALJ's decision slightly mischaracterizes the VE's testimony. The ALJ asked the VE whether someone of same age, education, work history, and RFC as Michelle could perform her prior work. The VE testified that such an individual could perform Michelle's past work as a store manager as

generally performed and as a billing clerk as actually and generally performed. (R. 56-57). However, the VE later clarified that billing clerk position could not be done as generally performed, and the ALJ's decision does not reflect this clarification. *Id*. at 57 (VE testifying: "Judge I made a mistake, the billing clerk would actually be eliminated per DOT for the fingering because the fingering is constant in the billing clerk."). Thus, the ALJ lacked substantial evidence to conclude that Michelle could perform her past relevant work as a billing clerk as generally performed.

Additionally, Michelle contends that her own work history report suggests that the billing clerk job as actually performed required fingering constantly. Doc. 25 at 9 n.8; R. 201. The Acting Commissioner responds that the VE's testimony is consistent with Michelle's work history report because she reported using her hands to type, write, or handle small objects five hours per day as a billing clerk, which falls withing the definition of "frequent." Doc. 29 at 28; R. 201. The Court need not resolve this issue because any error with respect to the ALJ's step four finding regarding the billing clerk job as actually and generally performed was harmless. Even if Michelle cannot perform her past work as billing clerk position as generally performed and as she actually performed, the ALJ identified other past relevant work that Michelle could perform. The VE testified that a person with Michelle's limitations could perform her past relevant work as a retail manager as generally performed, and the ALJ identified the job of retail manager as generally perform as past relevant work to which Michelle could return. (R. 24, 56). Michelle's only challenge as to the retail manager job is that it is generally performed at a light exertional level and she should be limited to sedentary work. For the reasons explained above in Section II(A), Michelle did not meet her burden of showing that she is unable to perform the standing, walking, and lifting limitations of light work and thus, is limited to sedentary work and unable to perform

31

the job of retail manager as generally performed. Accordingly, substantial evidence supports the ALJ's finding at step four regarding the retail manager job as generally performed, and any error as to other past relevant work would be harmless because the ALJ would have reached the same decision at step four even if he did not identify the billing clerk position as a job that Michelle could perform. *Wilder*, 22 F.4th at 654 (an error is harmless if the ALJ would have reached the same result even without the error).

## III. <u>CONCLUSION</u>

For the reasons set forth above, the Court denies Plaintiff's request for reversal and remand [25], grants the Acting Commissioner's motion for summary judgment [28], and affirms the ALJ's decision.

**SO ORDERED.**

Dated: August 11, 2022

_____
Sunil R. Harjani
United States Magistrate Judge